IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05CV269

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER |
| E & H ELECTRICAL SERVICE, INC., | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the court upon the Defendant E&H Electrical Services, Inc.'s ("E&H") Motion for Summary Judgment.

**FACTUAL BACKGROUND**

This case involves a lawsuit brought by the Plaintiff EEOC on behalf of its Charging Party, Ronald Locklear ("Locklear"), a former employee of E&H. Locklear was employed by E&H from October 2002 until he quit on April 16, 2003. The Complaint alleges that Locklear was subjected to a hostile work environment because of his race, Native American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (as amended) ("Title VII").

E&H is a small residential electrical services company located in Indian Trail, North Carolina. The majority of E&H's business comes from new residential construction. Tim Ellison ("Ellison") is the sole owner of E&H. Locklear, a Native American, and member of the Lumbee Indian Tribe, was hired by Ellison and worked at E&H starting in October of 2002 as an

1

electrician's helper. Ellison knew Locklear was Native American when he hired him. During the six months he worked at E&H, Locklear asked for and received a raise and also received a Christmas bonus.

Prior to working at E & H, Locklear worked for a company called Universal Electric. At Universal Electric, he worked with Larry Miller ("Miller"), who also came to work for E&H during the same time period as Locklear. When Miller and Locklear worked together at Universal, Miller had called Locklear by the nickname "Chief." Before working with Locklear at Universal, Miller had worked with a man who was a Catawba Indian who wanted to be called "Chief" and that is how Miller claims that Locklear's nickname originated. Ellison and other E&H employees observed that Locklear and Miller were friends and got along well with each other. Miller was known E&H as a "jokester" who was always kidding around with other employees.

Most of the employees at E&H, including Locklear, worked on a "crew" consisting of a lead man electrician and one or two helpers. The helpers are in charge of loading the truck in the morning and performing electrical wiring as directed by the lead man. Each crew operates out of and travels to and from jobs on a company van. Locklear was on a crew with Roger Helms. Each morning, the employees arrive at the shop and Ellison gives the electricians work tickets detailing their crew's work assignment. During this time, the crews usually congregate in the facility's 5000 square foot warehouse in order to load materials and supplies for the day's work assignment. Employees generally spend 15 to 20 minutes at the shop in the mornings loading the vans. During this time the employees and Ellison often joke around and tease each other. All crews then depart from E&H by 8:00 a.m. to go to the jobsite. All crews leave the jobsite at 4:30

2

and return to the shop.  Helpers are free to leave as soon as they return to the shop. Some employees hang around the shop and talk and joke with Ellison.

Many of the employees at E&H have nicknames and refer to each other by those nicknames instead of by their given names. In addition to having nicknames, employees often tease and joke with one another and occasionally use profanity, which is common in a construction-related business.  Locklear was known to have engaged in this type of banter and horseplay.

Locklear alleges that during his six-month employment with E&H he was subjected to slurs, jokes and comments about Native Americans by Ellison, coworker Larry Miller ("Miller") and co-worker Woodrow Wilson ("Wilson").   This harassment occurred mostly when the crews were gathered at E&H's facility in the mornings and evenings.   Locklear claims that he was at the facility approximately 30-45 minutes each morning.  After returning from the jobsite, Locklear claims that he did not stick around the shop to talk or "fellowship" with the other employees.

Locklear alleges that when he and Miller were both at the facility, Miller would refer to Locklear as "Injun Joe," "chief," "redskin," and "half-breed."  On Locklear's first day of work, Miller remarked that Locklear was "one of them Lumbee Indians" and that "some people sat they ain't even Indians."  When Locklear was passed over for a lead position, Miller said "Injun Joe, are you going to let [Ellison] do you like that?"  When Locklear asked what he meant, Miller answered "Well, they done took all your land.  Now he's going to sit right there and take your van and give it to someone over you."  Locklear told Miller not to refer to him as "Injun Joe."

Miller told Ellison and the other employees that Locklear's nickname was "Chief."

Locklear stated that "almost daily" Miller called him "Chief," "Big Indian," and "Lumbee." Locklear complained to Miller several times about his use of "racial terms," and Miller would respond that "he didn't mean nothing by it."

Locklear claims that Wilson referred to him as "spear chucker," "Indian Joe," and "redskin." and made "corny Indian jokes" that related to "totem poles" and "squaws." When Locklear complained to Wilson, Wilson would respond that he "didn't mean no harm by it."

Locklear alleges in his deposition that when he was interviewed on October 14, 2003 by Ellison for the job at E&H, Ellison asked Locklear if he was "one of those damn Lumbees." Locklear did not mention this during the EEOC investigation. Moreover, in his Amended EEOC charge, Locklear indicates that the alleged harassment began on November 4, 2002. Ellison admittedly referred to Locklear as "Chief." On one occasion, Locklear went into Ellison's office after returning from a job site. Ellison, who was talking to several employees, said, "Chief, why don't you come in here and tell us about them sand niggers down in Lumberton." On another occasion, Ellison came to a job site looking for Locklear, presumably to verify that he was still working because Ellison had turned down his request to leave early. Locklear heard Ellison asking "Where is that damn Indian at?"

On April 16, 2003, Ellison met with five employees, including Locklear, about a code violation that the Mecklenburg County Inspectors had reported to E&H. Specifically, a house that E&H had wired did not pass inspection because the ground wires had been cut too short in violation of the City code. During this meeting, Ellison attempted to explain the inspection issue to the crew and how he wanted the problem corrected. Locklear and Ellison got into a dispute over the proper way to cut ground wires. Ellison became upset and started to yell at the

4

entire crew, using profanity. Locklear alleges that he objected to Ellison's use of profanity and was told that if he didn't like it he was free to leave. That day, Locklear resigned his employment with E&H.

Locklear alleges in his deposition that Ellison called him a "Damn stupid Indian" during the meeting. However, in his EEOC interview, Locklear indicated that he was offended by Ellison cursing because he is a Christian. The EEOC interview notes which Locklear verified as being accurate in his deposition are completely devoid of any reference to Ellison making the statement "stupid Indian" or "stupid damn Indian," or making any racial comments at all during this meeting.

## DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. Anderson v. Liberty Lobby, 477 U.S. 242 (1986). The party opposing the motion may not rest upon its pleadings but instead must provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in its favor. Id. at 248. The movant may be entitled to summary judgment merely by showing that the other side will not be able to prove an essential element of its case with respect to which it has the burden of proof. Celotex, 477 U.S. at 322-23.

The Plaintiff alleges that he was subjected to a racially hostile work environment. In order to prove a prima facie case of a racially hostile work environment, the Plaintiff must show:

1) that the conduct was unwelcome; 2) that the harassment was based upon race; 3) that the harassment was sufficiently severe and pervasive that it altered the conditions of employment and created an abusive working environment; and 3) that some basis exists for imputing liability to the employer. Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). Courts have made it clear that Title VII is not a "federal guarantee of refinement and sophistication in the workplace." Hartsell v. Duplex Products, Inc., 123 F.3d 766, 773 (4th Cir. 1997). Moreover, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Indeed, to be actionable, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc, 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 & 67 (1986)). The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee [does] not affect the conditions of employment to [such a] sufficiently significant degree [as] to violate Title VII." Meritor, 477 U.S. at 67

The court will focus its analysis on the "severe and pervasive" element. In order to determine if this element of the prima facie case is met, the court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "[T]he objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting

Harris, 510 U.S. at 23). This inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale, 523 U.S. at 81.

The court finds that Plaintiff's evidence, even when viewed in the light most favorable to the Plaintiff, simply does not rise to the level of severity and pervasiveness as to create a hostile working environment in violation of Title VII. First of all, there are no allegations of physically threatening behavior. Locklear admits in his deposition that the "name calling" and teasing were never physically threatening. Locklear further concedes that the alleged harassment never impacted his job performance, which remained "good" throughout his employment. Indeed, he received a raise and Christmas bonus. Thus, the court's analysis of Plaintiff's claim must focus on the frequency and severity of the alleged harassment.

Locklear could have only been exposed to the alleged name calling and teasing for a brief period each morning during which he loaded his truck. Locklear admits that Roger Helms, with whom he worked on a crew every day, did not subject him to harassment. Locklear admits that he did not hang around the shop in the afternoons, so he was not subjected to harassment at that time.

The "social context" in which the alleged harassment took place was the construction industry, where, Locklear admits, profanity and "construction talk" were common. Moreover, Locklear claims that he did not know, and therefore cannot dispute, that almost everyone that worked at E&H had a nickname. Locklear was known as an employee who engaged in horseplay and laughed at jokes told in his presence. Even if Locklear found his co-workers' comments to be subjectively offensive, the comments were made in a teasing, and not a hostile manner, within the context of a work environment in which teasing, joking, nicknames, profanity, and some

7

horseplay was common, as opposed to a work environment charged with racial hostility. See Faragher, 524 U.S. at 788. Locklear does not dispute that Ellison and others used "Chief" as a friendly greeting. He claims Ellison used the term "sand niggers," but fails to explain or establish how this term relates to Native Americans. The most egregious term Ellison allegedly used, "damn stupid Indian," was only alleged to have been used once, and is thus a stray remark. Locklear admits that Miller and Wilson both told him that they "didn't mean anything by" their comments. Indeed, there is no evidence that any comments were motivated by racial animus. Locklear states in deposition that he just "assume[s]" that the comments were made because of his race. Even considered collectively, the comments made to Locklear are not so objectively severe so as to create an abusive working environment.

Courts have rejected allegations of racial harassment based upon evidence which is comparable to or far more egregious than that alleged by Locklear. For example, in Greene v. Swain County Partnership for Health, 342 F.Supp.2d 442, 454-55 (W.D.N.C. 2004), the court found that the Native American plaintiff's evidence that a co-worker used the term "Token Indian," made derogatory comments about her black hair and high cheekbones, and made insensitive comments about Native American teen pregnancy rates was insufficiently severe and pervasive. In Li Li Manatt v. Bank of America, 339 F.3d 792, 795-99 (9th Cir. 2003), the court held that co-workers' comments to plaintiff such as "I am not a China man, I'm not like China man with their eyes like that," "China woman, China woman, get your butt over here," and pulling their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians were not severe and pervasive. See also Martin v. Merck & Co., 446 F.Supp.2d 615, 627-630 (W.D.Va. 2006) (numerous racially offensive comments and conduct over a span of years,

8

including employees' use of the word "nigger," altering workplace poster to include the word "nigger," displaying a racially offensive cartoon, holding a hangman's noose, the comment that black employee should: "go back to the jungle where he came from," referring to a black female employee's "unpleasant odor because she was a black woman" was found to be not sufficiently severe and pervasive to be actionable under Title VII.); Gustave-Schmidt v. Chao, 360 F.Supp.2d 105 (D.D.C. 2004) (supervisor's referring to Hispanic employee as "spic," yelling at her in front of other employees, making sexist comments and having her investigated, followed by another employee and closely monitored, was not severe and pervasive); Smith v. Beverly Health and Rehab. Servs., Inc., 978 F.Supp. 1116 (N.D.Ga. 1997) (black nursing assistant's hostile work environment claim, predicated on several racially charged statements, including supervisor's comments that: "all that mooly can do is make coffee and bring it to me," "these goddamn Georgia niggers think they own Georgia," and "where I come from niggers knew their place," rejected because comments were offensive utterances and were not sufficiently severe and pervasive).

Plaintiff's evidence simply does not establish a workplace "permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm." Jordan v. Alternative Resources Corp., 458 F.3d 332, 340 (4th Cir. 2006). Since Plaintiff cannot establish that the alleged harassment was sufficiently severe or pervasive, the claim must fail.

IT S THEREFORE ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED.

Signed: March 19, 2007

Graham C. Mullen
United States District Judge